# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| HAROLD L.  LEONARD,<br>d/b/a The Leonard Clinic of Chiropractic,<br>Plaintiff, | CIVIL ACTION |
| v. | NO. 04-5310 |
| EDUCATORS MUTUAL LIFE INSURANCE CO.,<br>Defendant. |  |

## Memorandum and Order

YOHN, J.                                                                   October ___, 2007

Plaintiff Harold L. Leonard ("Dr. Leonard"), doing business as The Leonard Clinic of

Chiropractic ("the Clinic"),[1] brought suit against defendant Educators Mutual Life Insurance Co.

("Educators") under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et*

*seq*. ("ERISA") to recover unpaid medical benefits owed under a group insurance policy.

Educators brought a motion for summary judgment on plaintiff's complaint pursuant to Federal

Rule of Civil Procedure 56(c).  Upon consideration of the motion for summary judgment, the

court raised the issue of federal subject matter jurisdiction *sua sponte*, as it appeared to be

lacking, and requested supplemental briefs from the parties on that issue.[2]  For the reasons that

follow, I hold that the plan at issue is governed by ERISA, but I will grant Educators's motion for

---

[1] The Clinic is listed as a plaintiff in the matter, but is not registered as a fictitious name;
therefore, that entity may not bring suit.

[2] "A federal court has the obligation to address a question of subject matter jurisdiction
*sua sponte*."  *Meritcare Inc. v. St. Paul Mercury Ins. Co.*, 166 F.3d 214, 217 (3d Cir. 1999).

summary judgment as to plaintiff's claim for benefits.

## I. Background

### A. Factual History[3]

Educators is a mutual life insurance company located in Pennsylvania, which now operates by the name of Eastern Life & Health Insurance Co. (Pl. Ex. 38 ("Agreed Facts") ¶ 2; Def. Summ. J. Mem. 1 n.1.) In 1983, Dr. Leonard opened the Clinic at 1285 Manheim Pike, Lancaster, Pennsylvania, 17603. (Agreed Facts ¶ 4.) In July of 1990, the Clinic applied for group medical and life insurance coverage for its employees through Educators. (Agreed Facts ¶ 5; Def. Ex. 3.) At that time, Dr. Leonard's insurance agent was John C. Snyder (Agreed Facts ¶ 15); however, because the Clinic was considered a very small client, Snyder's assistant was primarily responsible for dealing with the Clinic (Def. Ex. 29 ("Synder Dep.") 7). In the application, the address of the clinic was reported as 1285 Manheim Pike, and three employees were to be covered by the policy. (Def. Ex. 3.) Educators did not offer or issue individual medical insurance plans. (Synder Dep. 32.)

Educators issued a group medical insurance policy and group life insurance coverage for Dr. Leonard and the Clinic's employees, including Dr. Leonard's wife, Diane Leonard. (Agreed Facts ¶ 5.) Educators assigned the Clinic group insurance policy number 8098. (Agreed Facts ¶ 6.) In order to qualify for group coverage, Educators required the Clinic to have at least three

---

[3]There are few disputed facts in this case. The following account contains the admitted facts and plaintiff's evidence because when deciding a motion for summary judgment courts must view all facts and inferences in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

employees, (Def. Ex. 8; Def. Ex 30 ("Rankin[4] Dep.") 11), working at least thirty hours per week and compensated for their services, (Def. Summ. J. Mem 2).  After 1996, the Clinic was only required to have two employees.  (Rankin Dep. 11.)  In the Clinic's application dated December 2, 1997, there were reported to be a total of two eligible employees.  (Pl. Ex. 8.)  Educators reviewed the policies on an annual basis and notified customers of new prices for coverage.  (Snyder Dep. 28.)  Dr. Leonard paid the monthly invoices for health and life insurance to Educators.  (Agreed Facts ¶ 14.)

In the fall of 1993, Dr. Leonard decided to resume his education and seek a degree in physical therapy from the University of Delaware.  (Agreed Facts ¶ 11.)  Dr. Leonard sold the Clinic to another chiropractor, Dr. Charles Czop, who took over the Clinic on January 1, 1994.  (Agreed Facts ¶ 11; Def. Ex. 26 ("Dr. Leonard Dep.") 28.)  Dr. Leonard was not an employee of Dr. Czop, but he continued to perform some services at the Clinic, including consultation with Dr. Czop and various insurance companies.  (Pl. Ex. 35 ("Dr. Leonard Aff.") ¶ 2; Dr. Leonard Dep. 33; Pl. Ex. 27 ("Diane Leonard Dep.") 10.)  Dr. Leonard also maintained a lock box for mail at the Clinic through March of 1999.  (Dr. Leonard Aff. ¶ 2.)  Dr. Leonard did not inform Educators of the fact that he had sold his Clinic or that the clinic at the site was being operated by Dr. Czop.  (Def. Summ. J. Mem. 3.)  During Dr. Leonard's time at the University of Delaware, through February of 1999, the Leonards maintained a residence at 1364 Country Club Drive, Lancaster, Pennsylvania.  (Agreed Facts ¶ 13.)

On May 25, 1995, pursuant to Dr. Leonard's request, Dr. Leonard's Pennsylvania chiropractic license was placed on inactive status.  (Pl. Ex. 9.)  According to Educators, it was

---

[4]Kimberly A. Rankin is Vice President and Corporate Secretary for Educators.

not aware that Dr. Leonard was not licensed to practice in Pennsylvania at that time (Def. Summ. J. Mem. 4) and Dr. Leonard has not disputed that fact.  In September of 1995, Dr. Leonard opened a chiropractic clinic in Ellicott City, Maryland, and the Leonards maintained a second residence in a condominium in Ellicott City, Maryland.  (Agreed Facts ¶¶ 10, 13.)  Dr. Leonard, Diane Leonard, and several other employees operated the Ellicott City clinic, but it was affiliated with a large chiropractic organization under the name Yalich Clinic of Ellicott City.  (Agreed Facts ¶ 10.)  In late summer of 1997, Dr. Leonard ceased his affiliation with the Yalich Clinic and began operating as the Back & Neck Pain Treatment Center of Ellicott City; this clinic was a sole proprietorship.  (Agreed Facts ¶ 11.)  Diane Leonard provided services to Dr. Leonard as an office manager for the Back & Neck Pain Treatment Center of Ellicott City, although she was not compensated for those services.  (Diane Leonard Dep. 16-18.)  After the Leonards separated in June 1997, Diane Leonard ceased providing any services to Dr. Leonard's clinic in Maryland. (Diane Leonard Dep. 8.)

According to Educators, Dr. Leonard did not notify it that he was practicing in Ellicott City, Maryland (Def. Summ. J. Mem. 4); however, while Dr. Leonard practiced in Maryland, he made payments to Educators from his Maryland checking account, which checks stated his Maryland address (Leonard Aff. ¶ 2).  Educators also issued several Explanations of Benefits ("EOBs") to Dr. Leonard at his Ellicott City address and corresponded with Dr. Leonard at that address.  (Pl. Ex. 39.)

The Clinic submitted an application for life insurance and comprehensive major medical insurance dated October 30, 1997, with a desired effectiveness date of October 1, 1997.  (Def. Ex. 11.)  The reason for the application was to change the Clinic's medical insurance plan from

an indemnity plan to a preferred provider organization ("PPO") plan because, according to

Snyder's recollection, Educators came out with a new policy series that was likely advantageous

for the Clinic's employees.  (Synder Dep. 14.)  Snyder prepared and signed the application

(Snyder Dep. 14-15; Def. Ex. 11), and Dr. Leonard signed the application (Leonard Dep. 122;

Def. Ex. 11).  The Clinic's application stated the name of the business as "Leonard Chiropractic

Clinic" and the address of the business as "1285 Manheim Pike, Lancaster, PA, 17601."  (Def.

Ex. 11.)  Employee application forms were submitted on behalf of Dr. and Diane Leonard.  (Def.

Exs. 12, 13.)  Dr. Leonard's application stated that he worked thirty hours per week as a

"Chiropractor / Consultant." (Def. Ex. 12.)  The application stated, among other things, above the

signature line, "I represent that I am actively and regularly working at least 30 hours a week for

the employer named above . . ." (*Id.*)  Diane Leonard's application stated that she worked thirty-

five hours per week and that her job duties included office management and marketing.  (Def.

Ex. 13.)  Diane Leonard denies preparing or signing this form.  (Diane Leonard Dep. 106-08).

Dr. Leonard admits preparing a portion of this form, but stated that he did not sign it on Diane

Leonard's behalf.  (Dr. Leonard Dep. 140-41.)  It is undisputed that by this time Diane Leonard

was no longer working for Dr. Leonard at any location and that they were, in fact, separated.

Snyder prepared a follow-up application for insurance, dated December 2, 1997, with a desired

effectiveness date of December 1, 1997, which was submitted to Educators.  (Def. Ex. 14.)

Educators issued a new group PPO policy to Dr. Leonard and the Clinic with an effective

date of July 1, 1998.  (Agreed Facts ¶ 19.)  A booklet entitled "Your Group Medical Insurance

Benefits," which included a Master Certificate effective July 1, 1998, was also issued. (Def. Ex.

2; Pl. Ex. 13.)  In a section entitled "Eligible Employee," this group policy stated:

**You** must be a US citizen and performing all of the duties of **your** job with a **covered employer** on a full-time basis.  This may be at either:

- the **covered employer's** normal place of employment; or
- at some other place to which the regular business operations of the **covered employer** require **you** to travel.

To be "full-time" **you** must:

- regularly work for the **covered employer** at least 30 hours per week; and
- be on the regular payroll of the **covered employer** for that work.

 (Pl. Ex. 13 at 32; Def. Ex. 2 at 32 (emphasis in original).)  In another section, entitled

"Termination of your medical coverage," the policy stated as follows:

**Your** medical coverage will terminate at 11:59 p.m. on the earlier of the following:

- the date the **plan** terminates; or
- the date **your** employer ceases to be a **covered employer**; or
- the day concurrent with or following: (a) the date **you** are no longer a member of an eligible class; or (b) the date **you** are no longer **an active employee**, except as provided under the Continuation of Coverage Provision, below; or (c) the date **you** retire.

(Pl. Ex. 13 at 6; Def. Ex. 2 at 6 (emphasis in original).)  The July 1, 1998 group policy also

included the following General Provision:

Statements made by you.
         All statements made by you, in the absence of fraud, are representations and not warranties.  A statement made by you may be used to contest your entitlement to coverage only if: (a) it is part of a written application; and (b) a copy of the application has been given to you or your beneficiary; and (c) the coverage for which the statement was made has been in effect for less than two years during your lifetime.

(Agreed Facts ¶ 20; *see also* Pl. Ex. 13 at 28.; Def. Ex. 2 at 28.)

Unlike previous times the Leonards had separated, two months following their separation

in June 1997, Diane Leonard filed for divorce from Dr. Leonard.  (Leonard Aff. ¶ 13.)  Health

coverage for Diane Leonard was an issue in the proceedings, and on December 5, 1997, the Court

of Common Pleas ordered Dr. Leonard to provide medical insurance coverage for Diane

Leonard.  (Agreed Facts ¶ 25; Pl. Ex. 18.)  In August of 1999, Diane Leonard was diagnosed with

cancer.  (Agreed Facts ¶ 24.)  According to Dr. Leonard, because Diane Leonard insisted on

having an Educators insurance policy, the court ordered him to maintain the Educators' policy,

even though he would have preferred to change to Blue Cross / Blue Shield or Health America.

(Dr. Leonard Aff. ¶ 29.)  He specifically avers that the monthly premium he paid to Educators

was over twice the cost of a Blue Cross / Blue Shield Policy.  (Dr. Leonard Aff. ¶ 29.)

Due to worsening orthopedic problems, Dr. Leonard discontinued treating patients in the

fall of 1998.  (Agreed Facts ¶ 21.)  As a consequence of his disability, another chiropractor

worked at Dr. Leonard's Ellicott City clinic approximately three days a week, until June 1999

when the Ellicott City office was closed.  (Agreed Facts ¶ 23.)  Although he no longer treated

patients, Dr. Leonard maintained HMO contracts and continued to consult with patients through

the end of 2003.  (Dr. Leonard Aff. ¶ 17-19.)

On December 21, 1998, Dr. Leonard began using the services of Murray Insurance

Associates, Inc. ("Murray Insurance"), and on January 4, 1999, Educators advised Snyder of Dr.

Leonard's request to recognize a new broker of record and so recognized Murray Insurance.

(Agreed Facts ¶¶ 16-17.)  The next month, in February of 1999, the Leonards sold their residence

in Lancaster and the mailbox at 1285 Manheim Pike was discontinued.  (Agreed Facts ¶ 30.)

When Paul Ronvak, the Clinic's insurance agent through Murray Insurance, was first assigned

the Clinic as a client he attempted to make contact with Dr. Leonard by going to the Clinic's

address at 1285 Manheim Pike; however, there was no longer a chiropractic clinic located there.

(Ronvak Dep. 43-44.)  Ronvak then had a conversation with a representative from Educators, whom he told that he could not find a location for the Clinic.  (Ronvak Dep. 44.)  At some point, that representative told Ronvak that there may be a post office box and an Ellicott City address, and that she would get back to him.  (Ronvak Dep. 45.)

Also sometime in 1999, Dr. Leonard received a letter from Educators stating that it would not be renewing the Clinic's policy because he was located in Maryland.  (Dr. Leonard Dep. 159.)  Dr. Leonard believed that the decision not to renew was prompted by Diane Leonard's cancer diagnosis rather than his location in Maryland.  (Dr. Leonard Dep. 160.)  Educators referred him to his insurance agent, Murray Insurance, and Rovnak advised Dr. Leonard that it would be better to have a Pennsylvania address, so Dr. Leonard obtained one.  (Leonard Dep. 160, 165.)  Sometime in August or September of 1999, Dr. Leonard signed a "Location Verification Document for Leonard Clinic of Chiropractic" stating that the Clinic's primary location was 1285 Manheim Pike, Lancaster, Pennsylvania ,17601, and the Clinic's second location was in Ellicott City; he added a handwritten note requesting mail be sent to "P.O. Box 422, Brownstone, PA 17508"; this document stated "cc: Educators Mutual Life Insurance Company."  (Ex. 19 of Leonard Dep.)  In October of 1999, Dr. Leonard wrote to Educators requesting "to change the billing and mailing address to:  P.O. Box 422[,] Brownstone, PA 17508."  (Pl. Ex. 17 of Leonard Dep.)  Based on verbal conversations with Educators, Rovnak believed that having two locations was permissible as long as the two locations were within driving distance.  (Def. Ex. 28 ("Rovnak Dep.") 95-96.)

In February 2002, Educators announced that it was exiting the group health insurance market.  (Rankin Dep. 7.)  The date of termination for the Clinic's policy was July 31, 2003.  (Pl.

Ex. 25.)

The Leonards submitted several claims for benefits to Educators.[5]  In May of 2003, Dr.

Leonard was seen at Deborah Heart & Lung Center for cardiac problems and, after initial tests,

Dr. Leonard was hospitalized on an emergency basis for heart bypass surgery.  (Agreed Facts ¶

28.)  On July 14, 2003, an Educators employee wrote an email stating "I need to stop all claim

payments for Harold Leonard . . . and his wife Diane" and that she had "turned the file over to

[Rankin] for review."  (Pl. Ex. 28.)  In August of 2003, Educators "froze" the Clinic's account

and stopped making all claims payments.  (Rankin Dep. 69, 88-89; Pl. Ex. 27.)  Educators,

through counsel, sent a letter dated September 15, 2003 to Dr. and Diane Leonard stating that

"Educators has information indicating that, for several years, the Clinic has not been an active

employer business operation, and that neither of you have been 'actively at work' for the Clinic."

(Ex. A of Def. Reply.)  The letter further requested specific documents and information from the

Leonards and stated that Educators would not process outstanding claims until the investigation

could be completed.  (Ex. A of Def. Reply.)  According to counsel for Educators, that

information was never received.  (Hr'g, Jan. 9, 2006 10:8-23, 11:19-24) and Dr. Leonard does

not assert otherwise.

**B. Procedural History**

On April 7, 2004, Educators filed suit in the Court of Common Pleas of Lancaster

County, Pennsylvania against Dr. Leonard, Diane Leonard, and the Clinic.  The complaint seeks

---

[5]Educators states that on behalf of Dr. Leonard, Educators has paid since January 1, 1998
the amount of $8,165.31 and has received charges for, but has not paid, $201,851.05.  Since
January 1, 1998, on behalf of Diane Leonard, Educators states that it has paid $135,573.88 and
has received charges for, but has not paid, $23,543.00.  (Pl. Ex. 32.)

a declaratory judgment that the Educators policy with the Clinic is null and void as of December 1, 1997, and consequently, that it is not responsible for the Leonards' outstanding medical bills. On June 30, 2004, plaintiff filed a counterclaim against Educators, alleging breach of contract and violations of ERISA and Pennsylvania's Unfair Insurance Practices Act, 40 Pa. Cons. Stat. § 1171.1 *et seq*.  In their ERISA claim, plaintiffs sought to recover unpaid medical benefits and attorneys' fees pursuant to 29 U.S.C. § 1132(a)(1)(B)[6] and § 1132(g)(1).[7, 8]  Six months later, on December 10, 2004, plaintiffs filed the instant suit.  The complaint originally brought two claims under ERISA—a claim for benefits and breach of fiduciary duty.  Educators filed an answer, wherein it asserted a counterclaim seeking a declaration that the Leonards' policy is null and void since at least December 1, 1997 due to misrepresentations and judgment in the amount of $143,739.19, less premiums and fees paid by plaintiff.  (Def. Answer ¶ 60.)

On January 27, 2005, Educators filed a motion to dismiss the federal complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) requesting the court decline to exercise jurisdiction over the case and instead defer to the parallel state court proceedings pursuant to the *Colorado River* abstention doctrine.  That motion was denied on May 5, 2005.[9]  The action was scheduled

---

[6]This section provides that "a participant or beneficiary" of an "employee benefit plan" may bring a civil action "to recover benefits due to him under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

[7]This provision states that in any action arising under ERISA, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C. § 1132(g)(1).

[8]ERISA provides that state courts have concurrent jurisdiction with United States district courts over actions arising under § 1132(a)(1)(B).  29 U.S.C. § 1132(e)(1).

[9]The court denied the motion on two grounds:  the breach of fiduciary claim fell within exclusive federal jurisdiction, thus the state and federal actions were not truly parallel, and there

for a non-jury trial on January 9, 2006.  At that time, counsel presented argument and certain

exhibits were entered into evidence.  However, during the proceedings, it became apparent that it

would be preferable to proceed once there had been an initial administrative review.  Therefore,

by agreement of the parties, the case was placed in civil suspense pending completion of the

review of the Leonards' claim for benefits.  (Order, Jan. 10, 2006.)  The plaintiff's breach of

fiduciary duty claim was dismissed by agreement of counsel.  (Order, Jan. 9, 2006.)

On August 11, 2006, Educators issued a determination letter stating that the Leonards

were ineligible for coverage as of December 1, 1997, and rescinding coverage as of that date.

(Def.'s Ex. 25.)  Educators ultimately determined that the Clinic did not have two eligible

employees, as "neither Dr. or Diane Leonard was working at least thirty hours per week in the

operation of the clinic's business, receiving full compensation for those services," and Dr.

Leonard had "consistently misrepresented material facts."  (*Id.*)  Educators also concluded that

Dr. Leonard was motivated into "fraudulently obtaining from Educators" group coverage because

pursuant to his divorce proceedings, he was required to purchase individual coverage for Diane

Leonard, which would have been "substantially more expensive."  (*Id.*)   Educators filed the

instant motion for summary judgment on November 6, 2006, requesting the court enter judgment

in its favor "on all claims asserted by Plaintiffs"; plaintiff filed a response to which Educators

filed a reply.

In considering Educators's motion for summary judgment on the complaint, the court

raised a question as to whether there existed federal question subject matter jurisdiction, pursuant

were not "exceptional" circumstances warranting abstention even if the proceedings were
parallel.  *See Leonard v. Educators Mut. Life Ins. Co.*, 2005 U.S. Dist. LEXIS 7941 (E.D. Pa.
May 5, 2005).

to 28 U.S.C. § 1331.  (Order, June 27, 2007.)  The parties have now submitted supplemental briefing on the issue of jurisdiction.  Plaintiff asserts that the court should retain federal question subject matter jurisdiction because the health insurance policy was governed by ERISA at the time it was created and changing the status of said plan would be contrary to the purposes of ERISA, regulations issued by the Department of Labor, and the parties' intentions.  Educators argues that under the applicable case law, the plan at issue is plainly not covered by ERISA.

**II. Subject Matter Jurisdiction**

**A. ERISA Background**

ERISA covers two kinds of employee benefit plans: employee welfare benefit plans and employee pension benefit plans.  29 U.S.C. § 1002.  Collectively, they are called employee benefit plans. § 1002(3).  An employee welfare benefit plan is defined as

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . .

§ 1002(1).  A pension plan is defined as

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—(i) provided retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, . . .

§ 1002(2).

The Secretary of Labor, charged with "prescribing such regulations as he [or she] finds

necessary or appropriate to carry out the provisions of this title," § 1135, has issued regulations

clarifying the definitions contained in § 1002.  *See* 29 C.F.R. 2510.3-3 ("This section clarifies the

definition . . . of the term 'employee benefit plan' for purposes of title I of the Act and this

chapter. . . to determine whether they constitute employee benefit plans . . . .").  The regulations

state:

> (c) Employees.  For purposes of this section:
>
> (1) An individual and his or her spouse shall not be deemed to be employees with respect to a trade or business, whether incorporated or unincorporated, which is wholly owned by the individual or by the individual and his or her spouse, and
>
> (2) A partner in a partnership and his or her spouse shall not be deemed to be employees with respect to the partnership.

*Id.*  The Supreme Court has clarified that these regulations apply to the threshold issue of

whether an ERISA plan exists, "not to the statutory definitions of participant and beneficiary."

*Yates v. Hendon*, 541 U.S. 1, 20 (2004).

Under paragraph (a)(1)(B) of section 1132 of ERISA, a "participant or beneficiary" may

bring a civil action "to recover benefits due to him [or her] under the terms of his [or her] plan, to

enforce his [or her] rights under the terms of the plan, or to clarify his [or her] rights to future

benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  Federal district courts and

state courts have concurrent jurisdiction over actions brought under that paragraph.  § 1132(e)(1).

**B.  Whether the Leonards' Plan is Covered by ERISA**

The Third Circuit has spoken directly to the structure of the plan at issue in this case as it

currently exists and has determined that it does not come within the scope of ERISA.  In

*Matinchek v. John Alden Life Ins. Co.*, 93 F.3d 96 (3d Cir. 1996), Matinchek and his wife, sole

owners of a funeral home, had enrolled in a group health insurance plan. *Id.* at 102.  Matinchek

filed suit against the insurance company seeking to recover benefits provided by the policy. *Id.* at

99.  From the outset of the litigation, both the parties and the district court assumed that the

dispute was governed by ERISA and that ERISA was the source of the court's federal question

jurisdiction. *Id.*  The Third Circuit found that the ERISA statutory scheme did not address

whether an insurance plan covering only a business owner and his or her immediate family

members can qualify as an employee welfare benefit plan. *Id.* at 100.  The court noted that

Department of Labor regulations exclude from ERISA's coverage those plans that do not cover

any employees and its rule that "an individual and his or her spouse [are] not . . . deemed to be

employees with respect to a trade or business . . . which is wholly owned by the individual or by

the individual and his or her spouse." *Id.* (quoting 29 C.F.R. § 2510.3-3(c)(1)).  In light of these

regulations, the goals of ERISA, and common sense understanding of the terms "employer" and

"employee," the court held "that an insurance coverage plan covering only a sole business owner

and his or her [spouse] cannot qualify as an employee welfare benefit plan covered by ERISA."

*Id*. at 101; *see also Leckey v. Stefano*, 263 F.3d 267, 270 (3d Cir. 2001) (reiterating and

explaining the holding of *Matinchek*).  In *Yates*, the Supreme Court recently confirmed this

holding, concluding: "Plans that cover only sole owners or partners and their spouses, the

regulation instructs, fall outside Title I's domain.  Plans covering working owners and their

nonowner employees, on the other hand, fall entirely within ERISA's compass." *Yates*, 541 U.S.

at 21 (internal citations and footnotes omitted).[10]  Accordingly, as of the date from which

---

[10]Portions of the Third Circuit's discussion in *Matinchek* are arguably overruled by the
Supreme Court's decision in *Yates,* 541 U.S. 1.  For instance, the Third Circuit stated, "Congress
clearly intended 'employer' and 'employee' to be mutually exclusive definitions under ERISA."

Educators contends the policy should be rescinded, it would not have been deemed an ERISA-covered employee benefit plan as it was only a plan covering a sole business owner and his spouse.

**C. Whether a Plan May Lose its ERISA Status**

Plaintiff argues that because the plan at issue was covered by ERISA when it was first created—as it covered at least one additional employee—it should not lose its status due to employee attrition where, as here, Dr. Leonard's stated reason for not having any additional employees was due to his health problems.  Educators argues that the question of whether a plan may lose ERISA status due to employee attrition is not necessary for the court to address as the Leonards' policy renewed annually and the Leonards were the only plan participants for several years prior to the point at which plaintiff seeks benefits.

As described above, the Supreme Court recently took up the question of whether a "working owner of a business" may "qualify as a 'participant' in a pension plan covered by [ERISA]."  *Yates*, 541 U.S. at 6.  The Court held that where "the plan covers one or more employees other than the business owner and his or her spouse, the working owner may participate on equal terms with other plan participants."  *Id.*  Therefore, at the inception of the Leonards' plan, the plan was governed by ERISA as it included another employee in addition to Dr. and Diane Leonard.  *See id.*; *Leckey*, 263 F.3d at 272 (finding plans governed by ERISA as

---

*Matinchek*, 93 F.3d at 101.  In *Yates*, the Court held that working owners could be participants in employee benefit plans where there were non-employer participants in the plan.  *Yates*, 541 U.S. at 16 (stating "a working owner can wear two hats, as an employer and employee").  However, *Matinchek*'s relevant holding that a plan only covering a sole owner and his or her spouse is not an ERISA plan remains intact.  *Yates*, 541 U.S. at 21.

each had a least one employee-participant).  Whether a plan may lose its ERISA status due to

employee attrition presents a substantial question, which the Third Circuit has yet to address.  *See*

*Leckey*, 263 F.3d at 270 ("We need not decide when a plan's ERISA status ought to be

determined or whether a plan may lose its ERISA status by attrition as we conclude that even at

the time of the alleged distributions, both plans were governed by ERISA.").

The Ninth Circuit[11] has resolved that for purposes of an employee welfare benefit

plan—as opposed to a pension plan—whether a plan is ERISA qualified should be "determined

after considering the purpose of the plan *when it was established* or as it is maintained."  *In re*

*Stern*, 345 F.3d 1036, 1041 (9th Cir. 2003), *cert. denied*, 541 U.S. 936 (2004) (emphasis added)

(citing *Peterson v. Am. Life & Health Ins. Co.*, 48 F.3d 404, 407-08 (9th Cir. 1995), *cert. denied*,

516 U.S. 942 (1995)).  In *In re Stern*, the plaintiff argued that ERISA applied to the pension plan

at issue in order to exclude the plan's assets from the bankruptcy estate.  *In re Stern*, 345 F.3d at

1040-41.  However, at the time the plaintiff filed his petition for bankruptcy, the only participant

in the plan was the plaintiff, as a working owner, and his spouse, as he had married the only other

employee covered by the pension plan.  *Id.* at 1039, 1041.  The district court applied the Ninth

Circuit's decision *In re Lowenschuss*, 171 F.3d 673, 680 (9th Cir. 1999), *cert denied*, 528 U.S.

877 (1999), wherein the court had determined that the "status of the pension plan is determined

as of the date of the bankruptcy filing," to find that the plan was no longer ERISA qualified.  *In*

---

[11]While I certainly am not bound by a decision emanating from the Ninth Circuit, its
persuasiveness is more weighty when deciding ERISA-related issues.  The Third Circuit has
noted "that, in the context of ERISA, maintaining uniformity of decisions is an important
consideration" and though "certainly not bound to create uniform common law rules, we must
attempt, to the extent possible, to harmonize our own federal common law rules with those of
other federal courts of appeals."  *Matinchek*, 93 F.3d at 101 (internal citations omitted).

*re Stern*, 345 F.3d at 1041.  On appeal, the plaintiff argued that under the Ninth Circuit's

precedent in *Peterson*, 48 F.3d at 407-08, the plan, which was ERISA qualified at its inception,

should maintain its ERISA qualification, even though the plan currently covered only the

plaintiff and his spouse.  *In re Stern*, 345 F.3d at 1040-41.  In *Peterson*, the Ninth Circuit had

held that a plan remains ERISA qualified if it covers an employee other than the owner at the

time the plan was established.  *In re Stern*, 345 F.3d at 1041 (discussing *Peterson*, 48 F.3d at

407-08).  Thus, the Ninth Circuit was tasked with reconciling its decision in *In re Lowenschuss*

with its decision in *Peterson*.

      The court ultimately determined that "the fact that *Peterson* concerned an employee

welfare benefit plan and *In re Lowenschuss* addressed a pension plan is outcome determinative,"

as the definition of an employee welfare benefit plan focused on the past, whereas the definition

of a pension plan focused on the present.  *In re Stern*, 345 F.3d at 1041.  The Ninth Circuit

focused on the language of the two provisions:

> 29 U.S.C. § 1002(1) defines an ERISA-qualified welfare benefit plan as one
> "established or maintained . . . for the purpose of providing [benefits] for its
> participants or their beneficiaries[.]" 29 U.S.C. § 1002(1) (West 1999).  In contrast,
> a pension plan is ERISA-qualified only "to the extent that by its express terms or as
> a result of surrounding circumstances [the pension plan] provides retirement income
> to employees . . ." 29 U.S.C. § 1002(2)(A)(i) (West 1999).

*In re Stern*, 345 F.3d at 1041 (alternations in original); *see also Peterson*, 48 F.3d at 408

("Moreover, the . . . policy originally covered a non-partner employee in addition to Peterson and

his partner.  A policy is governed by ERISA if it is '*established* or maintained by an employer . . .

for the purpose of providing [medical insurance] for its participants or their beneficiaries.'"

(emphasis in original) (citing 29 U.S.C. § 1002(1))).  Thus, *In re Stern* makes clear that the

ERISA status of an employee welfare benefit plan is determined at the time the plan is established, regardless of whether the plan participants change.

Because the Ninth Circuit is the only court of appeals that has examined this issue in depth, I will follow the reasoning of its decisions in *In re Stern* and *Peterson* and find that because the Leonards' insurance policy was covered by ERISA at its inception—i.e., at the time it was established—it continues to be covered by ERISA. Moreover, several district courts have adhered to this view as well. *E.g., Harman v. United Healthcare of Fla., Inc.,* 207 F. Supp. 2d 1355, 1357 (M.D. Fla. 2002) (finding that the insurance policy issued met the statutory criteria for an employee welfare benefit plan and thus "ERISA continued to govern the plan after September, 2001, though [the insured] became the sole plan participant"); *Nix v. United Health Care of Ala., Inc.,* 179 F. Supp. 2d 1363, 1369-1370 (M.D. Ala. 2001) ("Applying the plain meaning of the statute, the court finds that the phrase 'established or maintained' by an employer covers the situation where, as here, an employer sets up an insurance plan for both owners and employees, but later all employees cease to work for the employer, leaving only the owners covered under the plan."); *Miller v. Provident Life & Accident Ins. Co.*, 2000 U.S. Dist. LEXIS 14694, at *12 (C.D. Cal. Sept. 5, 2000) ("The statutory definition's use of the word 'or' supports the Court's interpretation that an insurance policy that was part of an established ERISA plan is governed by ERISA even if the plan is no longer maintained as an ERISA plan by the employer."); *Jaffe v. Provident Life & Accident Ins. Co.*, 2000 U.S. Dist. LEXIS 4417, 3-4 (S.D. Fla. Apr. 4, 2000) (rejecting plaintiff's contention that because at the time of plaintiff's disability the welfare benefit plan did not cover a non-owner employee the plan was not governed by

ERISA).[12]

I also note that language from the Supreme Court's decision in *Yates* can be read to suggest that a plan should not lose ERISA status once it has been deemed an ERISA plan.  The Supreme Court repeatedly noted that it would be anomalous to have disparate legal regimes apply to employees based on whether the employee was a working owner:

> Recognizing the working owner as an ERISA-sheltered plan participant also avoids the anomaly that the same plan will be controlled by discrete regimes: federal-law governance for the nonowner employees; state-law governance for the working owner.  ERISA's goal, this Court has emphasized, is uniform national treatment of pension benefits.  Excepting working owners from the federal Act's coverage would generate administrative difficulties and is hardly consistent with a national uniformity goal.

*Yates*, U.S. at 16-17 (internal quotations and citations omitted).  Later in the opinion, the Court summed up its holding and relied parenthetically on a case from the Fourth Circuit:

---

[12]I note that one case from this district was presented with the question of whether employee attrition alters the ERISA status of an employee welfare benefit plan and came to the opposite result.  In reaching its conclusion, the court in *Glickman v. United States Healthcare Systems of Pennsylvania., Inc.*, 268 F. Supp. 2d 443 (E.D. Pa. 2003), relied on *In re Lowenschuss*, 171 F.3d 673, and *Henglein v. Informal Plan for Plant Shutdown Benefits for Salaried Employees*, 974 F.2d 391, 398 (3d Cir. 1992).  As described above, *Lowenschuss* is not persuasive as the Ninth Circuit has foreclosed its reach to ERISA welfare benefits plans as opposed to pension plans.  In *Henglein*, the Third Circuit was tasked with determining whether the plaintiff-employees could prove the existence of an employee benefit plan under the test articulated in *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir. 1982).  *Henglein*, 974 F.2d at 398-99.  The Third Circuit determined that the employees' claim that there was an informal employee benefit plan "must be resolved not under state law, but under ERISA, which refers to the surrounding circumstances to determine if a plan existed *at the time benefits were denied*." *Id.* (emphasis added) (citing *Donovan*, 688 F.2d 1367).  The district court in *Glickman*, as well as the parties in that case, took the phrase "at the time benefits were denied" to require the determination of the existence of an ERISA welfare benefit plan not at the plan's inception, but on the date the court determined that benefits were denied.  *Glickman*, 268 F. Supp. 2d at 446.  Among several other reasons that the phrase from *Henglein* is not applicable here, in *Leckey*, the Third Circuit stated in no uncertain terms that it had not reached the issue of "when a plan's ERISA status ought to be determined," thus it was inappropriate to apply that phrase to this issue.

> Plans covering working owners and their nonowner employees, on the other hand, fall entirely within ERISA's compass. . . . [*Madonia v. Blue Cross & Blue Shield*, 11 F.3d 444, 449-50 (4th Cir. 1993)] ("[T]he regulation does not govern the issue of whether someone is a 'participant' in an ERISA plan, once the existence of that plan has been established.  This makes perfect sense: once a plan has been established, it would be anomalous to have those persons benefitting from it governed by two disparate sets of legal obligations.").

*Id.* at 21-22.  Given the Supreme Court's stated concern that "the same plan will be controlled by discrete regimes," *id.* at 17, it would seem equally problematic for a plan to be deemed an ERISA plan at its inception—thus having federal law apply to both working owners and other employees—only to have it subsequently lose its status and be governed by state law.[13]  The Third Circuit has similarly acknowledged that it would be questionable to have different law apply to the same plan, stating that "creat[ing] the anomaly of requiring some insureds to pursue benefit claims under state law while requiring others covered by the identical policy to proceed under ERISA . . . would frustrate Congress's intent of achieving uniformity in the law governing employment benefits."  *Wolk v. UNUM Life Ins. of Am.*, 186 F.3d 352, 357 (3d Cir. 1999) (citing *Peterson*, 48 F.3d at 409) (internal quotations omitted).  Moreover, recognizing that the protections of ERISA apply to the plan at issue also comports with "the intent of Congress 'that coverage under ERISA be construed liberally to provide the maximum degree of protection to working men and women covered by private retirement programs.'"  *Deibler v. United Food & Commercial Workers' Local Union* 23, 973 F.2d 206, 209 n.5 (3d Cir. 1992) (citing S. Rep. No.

---

[13]I note, however, that this concern is heightened in the circumstance described in *Yates* where a working owner may not be a plan participant with his or her employees because the federal and state regimes would operate contemporaneously with respect to the same plan.

93-127 (1973), *reprinted in* 1974 U.S. Code Cong. & Admin. News 4639, 4854).[14]  Accordingly,

I conclude that the plan at issue is governed by ERISA and this court has federal question subject

matter jurisdiction.  I will thus proceed to determine whether Educators is entitled to summary

judgment on plaintiff's claim for benefits.

### III.  Summary Judgment Standard

A court may only grant a motion for summary judgement, "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law."  Fed. R. Civ. Pro. 56(c).  "Facts that could alter the outcome are 'material,'

and disputes are 'genuine' if evidence exists from which a rational person could conclude that the

position of the person with the burden of proof on the disputed issue is correct."  *Ideal Dairy*

*Farms v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996) (citation omitted).

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-

movant is to be believed."  *Anderson*, 477 U.S. at 255.  In addition, "[a]ll justifiable inferences

are to be drawn in [the non-movant's] favor."  *Id.*  "Summary judgment may not be granted . . . if

there is a disagreement over what inferences can be reasonably drawn from the facts even if the

---

[14]Congress also stated the following with respect to the enactment of ERISA:

It is hereby declared to be the policy of this Act to protect interstate commerce and
the interests of participants in employee benefit plans and their beneficiaries, by
requiring the disclosure and reporting to participants and beneficiaries of financial
and other information with respect thereto, by establishing standards of conduct,
responsibility, and obligation for fiduciaries of employee benefit plans, and by
providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001.

facts are undisputed." *Ideal Dairy*, 90 F.3d at 744 (citation omitted).  However, "an inference

based upon a speculation or conjecture does not create a material factual dispute sufficient to

defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d

Cir. 1990) (citation omitted).  The non-movant must show more than "[t]he mere existence of a

scintilla of evidence" for elements on which he bears the burden of production.  *Anderson*, 477

U.S. at 252.  Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

**III. ERISA Standard of Review to be Applied to Educators's Decision to Deny Benefits**

     **A.**    ***Pinto*'s Heightened Arbitrary and Capricious Standard**

The Supreme Court has explained that a decision to deny benefits "is to be reviewed

under a *de novo* standard unless the benefit plan gives the administrator or fiduciary authority to

determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber*

*Co. v. Bruch*, 489 U.S. 101, 115 (1989).  When the administrator is given such discretion, the

court generally should apply the "arbitrary and capricious" standard.  In the Third Circuit, this

means that a court should overturn the decision of a plan administrator "only if it is 'without

reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Abnathya v.*

*Hoffman-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (citations omitted).

Here, the parties dispute whether the benefit plan at issue grants Educators discretionary

authority to determine eligibility for benefits and construe the terms of the Educators Policy.

(Pl.'s Summ. J. Mem. 6; Def.'s Resp. 9.)  The discretion required to trigger the arbitrary and

capricious standard of review need not be expressly stated in the plan, but may be inferred from

its terms. *Luby v. Teamsters Health, Welfare & Pension Trust Funds*, 944 F.2d 1176, 1180 (3d

Cir. 1991) (stating that no "magic words," such as "discretion is granted . . . ," need be expressly

stated in order for the plan to grant the administrator discretion to interpret plan terms and to hear

and decide disputes between alleged beneficiaries, so long as the plan on its face clearly grants

such discretion (quoting *De Nobel v. Vitro Corp.*, 885 F.2d 1180, 1187 (4th Cir. 1989))).  With

respect to the Clinic's plan, in a section entitled "Claims Provisions," under a subsection entitled

"Loss," the plan stated:

> **You** must send **us** proof of loss within 90 days after the date the qualifying expenses
> are **incurred**. We will not decline or reduce a claim if: (a) it is not reasonably
> possible to give proof in that time; and (b) the proof is submitted within one year
> from the date of incurral.  This one year period will not apply when **you** are not
> legally capable of submitted proof.  All proofs of loss must be satisfactory to **us**.

(Pl. Ex. 13 at 26; Def. Ex. 2 at 26 (emphasis in original).)  The requirement that the proof of loss

"must be satisfactory to *us*" is sufficient implied reservation of discretion for the plan

administrator to determine eligibility for benefits; thus, the arbitrary and capricious standard of

review applies.  *See Russell v. Paul Revere Life Ins. Co.*, 148 F. Supp. 2d 392, 400 (D. Del.

2001) ("Language requiring 'satisfactory proof' often implies an inference of discretion on the

part of the plan administrator.  In fact, several other circuit and district courts have found similar

language to be discretionary in nature."), *aff'd*, 288 F.3d 78, 82 (3d Cir. 2002); *Dorsey v.*

*Provident Life & Accident Ins*. Co., 167 F. Supp. 2d 846, 853 (E. D. Pa. 2001) (finding sufficient

reservation of discretion where insurer's "policy states that benefits will only be awarded if there

is 'proof of loss,' which is defined as written evidence satisfactory to [the insurer] that a claimant

is disabled").

Plaintiff argues alternatively for *de novo* review because even if the plan "gave Educators

discretion, it never effectively exercised it because Dr. Leonard was not informed of the result of its analysis until after this litigation began." (Pl. Mem. Opp'n Summ. J.) Plaintiff cites *Gritzer v. CBS, Inc.*, 275 F.3d 291 (3d Cir. 2002), where the Third Circuit held that even if the plan at issue grants discretion, where a trustee fails to act or exercise his or her discretion, *de novo* review is appropriate. *Id.* at 296. In *Grizter*, after the appellants made several unsuccessful inquires to the plan administrator, they filed a claim letter. *Id.* at 294. The plan administrator failed to respond within 90 days and thus, the appellants' claim was "deemed 'denied.'" *Id.* The appellants then filed suit in the district court and, nearly five months later, the plan administrator finally responded to their claim on the merits, denying them for the essentially the same reasons it invoked in the district court. *Id.* The Third Circuit held that the district court should have exercised *de novo* review because the plan administrator "apparently never made any effort to analyze appellants' claim much less to advise them of what that analysis disclosed until after this litigation was filed." *Id.* at 295. The court also addressed the plan administrator's contention that it "did eventually provide a written response, albeit after this litigation was commenced," concluding that "post-commencement-of-litigation determinations under the aegis of attorneys are not benefit eligibility analyses by a plan administrator to which a court must defer." *Id.* at 295 n.4.

The factual situation in the case at bar is distinguishable. First, Educators did not fail to respond but provided plaintiff with its initial analysis of the Leonards' eligibility for coverage and was engaged in an attempt to analyze their claims, but needed addition information, which it requested from them. (*See* Ex. A. of. Def. Reply.) Thus, the Leonards were on notice of the potential issues regarding their claim and that Educators was endeavoring to make a final

determination, but they failed to provide the additional information needed.  Second, although

Educators engaged in an administrative determination post commencement of litigation, this was

by agreement of the parties specifically so the court could engage in an analysis pursuant to *Pinto*

*v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 378 (3d Cir. 2000), of that administrative

determination.  (Hr'g, Jan 9, 2006 25:25-27:23.)  While this was somewhat of a procedural

irregularity, which will be taken into account in applying the *Pinto* factors, it does not mandate

*de novo* review.  Such a result would make the entire administrative review—to which the parties

agreed—superfluous.

     While I will not apply a *de novo* standard of review, the Supreme Court has made clear

that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a

conflict of interest, that conflict must be weighed as a 'factor in determining whether there is an

abuse of discretion.'" *Bruch*, 489 U.S. at 115 (citation omitted).  The Third Circuit has held that

"when an insurance company both funds and administers benefits, it is generally acting under a

conflict that warrants a heightened form of the arbitrary and capricious standard of review."

*Pinto*, 214 F.3d at 378.

     In the present case, Educators both funds and administers benefits under the policy.

Accordingly, the "heightened form" of the arbitrary and capricious standard of review, as

described in *Pinto*, applies to this case.  This "heightened form" requires courts "to consider the

nature and degree of apparent conflicts with a view to shaping their arbitrary and capricious

review of the benefits determinations of discretionary decisionmakers."  *Pinto*, 214 F.3d at 393.

More specifically, the court in *Pinto* established "a sliding scale method, intensifying the degree

of scrutiny to match the degree of the conflict," so that the arbitrary and capricious standard is

"more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is." *Id.* at 379, 392-93 (citations omitted).

*Pinto* offered a nonexclusive list of factors for courts to consider in assessing the nature and degree of the structural conflict of interest. *Id.* at 392. These factors include: (1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the administrator, since the company's financial or structural deterioration might negatively impact the presumed desire to maintain employee satisfaction. *Pinto*, 214 F.3d at 392.

In addition to the four factors discussed above, the *Pinto* court stated that courts should "look not only at the result—whether it is supported by reason—but at the process by which the result was achieved." *Id.* at 393; *see also Kosiba v. Merck & Co.*, 384 F.3d 58, 66 (3d Cir. 2004) ("Our precedents establish at least one more cause for heightened review: demonstrated procedural irregularity, bias, or unfairness in the review of the claimant's application for benefits."). The "procedural anomalies" in *Pinto* were: "(1) the insurer's reversal of its original determination without the examination of additional evidence; (2) a self-serving selectivity in the use of evidence; and (3) a bias in decision-making to the benefit of the insurer." *Russell*, 148 F. Supp. 2d at 406 (D. Del. 2001) (interpreting and citing *Pinto*). The burden of proof is on the claimant to show a heightened standard of review is warranted in a particular case. *See Kotrosits v. GATX Corp. Non-Contributory Pension Plan for Salaried Employees*, 970 F.2d 1165, 1173 (3d Cir. 1992). Plaintiff asserts that the procedural anomalies coupled with the *Pinto* factors require that Educators's determination be reviewed under a heightened arbitrary and capricious review that essentially equals *de novo* review.

26

**B.      Factors Demonstrating a Structural Conflict of Interest**

 To reiterate, *Pinto* found that in determining the severity of a structural conflict of

interest, courts should consider "the sophistication of the parties, the information accessible to

the parties, . . . the exact financial arrangement between the insurer and the company . . . [and]

the current status of the fiduciary."  *Pinto*, 214 F.3d at 392.  These factors will be discussed in

turn.

 With reference to the issue of the sophistication of the parties, plaintiff argues that this

factor weighs in favor of heightening the scrutiny because that plaintiff was not sophisticated in

terms of ERISA, never saw the Group Administration Manual, and did not discuss the employee

eligibility requirements with his insurance agent or anyone at Educators.  (Pl. Mem. Opp'n

Summ. J. 8 (citing Leonard Dep. 85, 89, 114).)  Educators argues that its eligibility determination

did not require a sophisticated knowledge of eligibility requirements but merely whether the

Leonards were full-time employees, which Dr. Leonard misrepresented.  (Def. Mem. Supp.

Summ. J.)   I find there was a sophistication imbalance between the parties as Dr. Leonard would

not have had ERISA or claims experience, whereas Educators has reviewed numerous such

claims.  *See Stratton v. E. I. DuPont de Nemours & Co.*, 363 F.3d 250, 254 (3d Cir. 2004).

However, Dr. Leonard was represented by counsel during the administrative process.

Accordingly, this factor warrants some heightening of the standard of review.  *See Post v.

Hartford Ins. Co.,* 2005 U.S. Dist. LEXIS 22511, **30-31 (E.D. Pa. Oct. 5, 2005).

 The information accessible to the parties does not weigh in favor of heightening the

standard of review.  By the time the Educators made its final administrative determination,

discovery in preparation for trial had been accomplished; both parties had made disclosures to

27

each other and submitted to the court proposed findings of fact.  Moreover, even before

Educators brought suit in the Court of Common Pleas, it had provided the Leonards with the

reasons it had suspended claims processing.

The financial arrangement between the insurer and the company merits substantial

heightening of the standard of review.  There is no longer any relationship between the Clinic

and Educators, thus there is nothing to mitigate Educators's incentive to deny individual requests.

*See Pinto*, 214 F.3d at 392 (stating with respect to this factor that "a court can consider whether

the insurance contract is fixed for a term of years or changes annually, and whether the fee paid

by the company is modified if there are especially large outlays of capital").

The fourth factor—the current status of the fiduciary—also warrants substantial

heightening of the standard of review as Educators is no longer in the health insurance market.

In *Pinto*, the Third Circuit pointed out that previous cases "generally assume that the company is

stable and will act as a repeat player."  214 F.3d at 392.  However, "[w]hen companies are

breaking up, or laying off a significant percentage of their employees, or moving all their

operations, [the incentive to maintain employee satisfaction is] diminish[ed] significantly."  *Id.*

Although Educators remains in the market for life, dental and short- and long-term disability

insurance, (*see* Rankin Dep. 7-8), and thus has some general reputational interest, its incentive to

maintain employee satisfaction is greatly diminished.  Thus, both the third and fourth factors

weigh strongly in favor of substantially heightening the standard of review.

**C.    Procedural Anomalies**

Plaintiff argues that procedural irregularities also dictate an elevated standard of review.

Plaintiff asserts that Educators's first concerns about Dr. Leonard's coverage are remarkably

coincidental with the date of his first submission of extensive bills for heart bypass surgery.  (Pl. Mem. Opp'n Summ. J. 10.)  Plaintiff points to an internal email from Educators's claims staff, sent within ten days of Dr. Leonard's bypass surgery, which states:  "I need to stop all claim payments for Harold Leonard . . . and his wife, Diane."  (*Id.* (citing Pl. Ex. 27).)  Taking this evidence in the light most favorable to plaintiff, it appears procedurally irregular that Educators would begin to question the Leonards' eligibility for claims at a time so contemporaneous with Dr. Leonard's surgery.

Plaintiff also takes issue with the length of time it took Educators to make determinations.  (Pl. Mem. Opp'n Summ. J. 10.)  Plaintiff explains that under the applicable regulations, an ERISA fiduciary has forty-five days from the date of receipt of the benefits claim to make an initial decision, with a permissible extension of fifteen days, 29 C.F.R. § 2560.503-1(f)(2)(iii)(B), but no EOBs were ever issued.  This is also procedurally irregular as it appears from the record that the first written notice plaintiff received concerning the status of these claims was the letter from counsel dated September 15, 2003.  Plaintiff also contends that the fact that Educators did not make a final administrative determination until after it filed the declaratory judgment suit in the Court of Common Pleas, where its position regarding coverage was made clear in a verified complaint, weighs in favor of heightening the standard of review.  This is also irregular; however, as stated above, the parties agreed to placing the case in civil suspense pending the administrative review and Educators appeared poised to make an administrative determination pre-litigation, but had not received necessary documentation from the Leonards, which plaintiff does not contest.

Taking all the factors that weigh in favor of heightening scrutiny together—most

significantly the financial arrangement between the parties, the current status of the fiduciary and the timing of the initial concerns regarding the Leonards' insurance—I will apply a standard of review "on the far end of the arbitrary and capricious 'range.'"  *Pinto*, 214 F.3d at 394.  Thus, while "a court may not substitute its own judgment for that of plan administrators under either the deferential or heightened arbitrary and capricious standard," *Stratton*, 363 F.3d at 256 (quoting *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc.*, 298 F.3d 191, 199 (3d Cir. 2002)), I will "examine the facts before the administrator with a high degree of skepticism," *Pinto*, 214 F.3d at 394.

## IV. Discussion

The issue before the court is whether Educators acted arbitrarily and capriciously under the heightened standard in determining that the Leonards were not eligible for benefits within the meaning of the Educators Policy.  In this analysis, the court may review only the evidence that was before Educators at the time the determination was made.  *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997).

Educators ultimately concluded that the Leonards were ineligible for coverage since at least 1997 because (1) the Clinic was no longer in operation; (2) there were not at least two employees as required by a group policy; (3) neither Dr. nor Diane Leonard was working at least thirty hours per week in the operation of the Clinic's business receiving full compensation for their services, and (4) Dr. Leonard consistently misrepresented material facts.  (Def. Ex. 25.) Educators also concluded that Dr. Leonard was motivated to make misrepresentations because he was required in his divorce to purchase individual coverage for Diane Leonard, which would have been substantially more expensive than the Educators group policy.  Plaintiff appears to

30

combine his objections to Educators's administrative determination with his assertion that there

was no fraud in the application for insurance. These are two separate bases for denying benefits.

However, I will attempt to address all of plaintiff's contentions that apply to whether the decision

of Educators was not supported by the record.

It cannot be said that the decision to deny benefits based on the Leonards' ineligibility

under the policy was "without reason, unsupported by substantial evidence or erroneous as a

matter of law," even when viewing the facts before Educators "with a high degree of

skepticism." The terms of the Educators plan are unambiguous. *See Bill Gray Enters. v.

Gourley*, 248 F.3d 206, 218 (3d Cir. 2001) ("Whether terms in an ERISA Plan document are

ambiguous is a question of law. A term is ambiguous if it is subject to reasonable alternative

interpretations." (quotation omitted)).

The policy in question is a group PPO policy to Dr. Leonard and the Clinic providing

group medical insurance benefits. Educators did not issue individual policies. The employer

was the Leonard Clinic of Chiropractic. It is undisputed that Dr. Leonard sold the Clinic in 1993.

Thereafter there was a period of time when he returned to school and later his chiropractic license

was declared inactive. He did open a business in Maryland but it is undisputed that this business

closed in September of 1999. The medical expenses which are the subject of the current claims

began accruing in June of 2003. Nowhere does plaintiff allege that there was a clinic operating at

that time owned by him.

The policy provides that employees must perform "all of the duties of your job with a

covered employer on a full-time basis." In order to be full-time the employee must "regularly

work for the covered employer at least thirty hours per week; and be on the regular payroll of the

covered employer for that work."  As of the time of the application for the policy in December of 1997 and as of the time of the accrual of the claim for the benefits at issue, it is undisputed that Diane Leonard was neither working for a covered employer at least thirty hours per week nor that she was on the regular payroll of the covered employer for that work.  The parties agree that Dr. Leonard and Diane Leonard separated in June of 1997 and that thereafter she neither worked on a full-time basis for the Clinic (defined as at least thirty hours per week) nor was on a regular payroll of the Clinic.  Thus, by at least June of 1997 there were never two employees by any stretch of the evidence and indisputably Diane Leonard was not an employee.

Likewise, it is undisputed that Dr. Leonard sold the Leonard Clinic of Chiropractic in 1993, returned to school from February of 1994 through some time in 1995 and allowed his chiropractic license in Pennsylvania to become inactive on June 1, 1995.  He performed chiropractic services in Maryland for a period of time but that terminated in September of 1999.  While he may have performed some consulting services thereafter, there is no evidence that he worked for the covered employer (the Clinic) that he worked at least thirty hours per week as required by the policy or that he was on the regular payroll of the Clinic for that work.  Thus, he too was indisputably not an employee at the time the claims accrued.

The policy provides that the medical coverage terminates on the date the employer ceases to be a covered employer or the date the employee was no longer an active employee.  Dr. Leonard provides no evidence that either he or Diane Leonard was an active employee at the relevant time.

Thus, these two bases supporting Educators's denial of benefits for the Leonards are reasonable and cannot be said to be arbitrary and capricious, even under a significantly

32

heightened standard of review.[15][16]  *See Clark v. Hartford Life & Accident Ins. Co.*, 2006 U.S.

Dist. LEXIS 84122, at *16 (E. D. Pa. Nov. 16, 2006) (granting summary judgment in favor of

insurer where the "denial of benefits was not arbitrary or capricious because [the insurer] applied

the uncontroverted facts to the unambiguous language of the policy and made the right

determination").  Accordingly, I will grant summary judgment in favor of Educators on

plaintiff's remaining claim in his complaint.[17]  An appropriate order follows.

---

[15]Educators determination that "as of December 1, 1997, the Clinic, in terms of a Lancaster-based business was no longer in operation," is a somewhat ambiguous conclusion and not entirely supported by record evidence.  It is not clear when Dr. Czop ceased operating in that space or when the name was officially changed.  In fact, plaintiff avers that he continued to do consultations with Dr. Czop and various insurance companies at the Manheim Pike office until it closed in 2000.  What is clear is that it was no longer Dr. Leonard's primary place of employment, although he continued to maintain a mailbox there and was forwarded mail.  However, this fact is not material because ample evidence supports Educators's determination that Dr. Leonard and Diane Leonard were not eligible under the policy.

Educators's conclusion that Dr. Leonard was motivated to make misrepresentations on the application for insurance because of the court order in his divorce proceedings that he provide insurance coverage for Diane Leonard is also not supported by record evidence.  The only supporting evidence in the administrative record is the order of the court requiring Dr. Leonard to provide coverage (Def. Ex. 17) and a letter apparently from Dr. Leonard's divorce attorney to Diane Leonard's attorney opining about the cost of insurance coverage (Def. Ex. 22).  It is not reasonable to make such an inferential leap. Moreover, Dr. Leonard has specifically averred to the contrary that the Educators policy was actually more expensive than an individual policy, which I must treat as true for purposes of this motion.  In any event, because I have determined that Educators's decision was reasonable for other reasons, this is not an issue of material fact.

[16]I would reach the same result even if I were to apply a de novo standard of review.

[17]In its memorandum of law in support of summary judgment, Educators also raised the issue of whether the policy was void as a result of misrepresentations on the application.  I will not reach this issue.  First, to the extent that Educators posits misrepresentations made by plaintiff as an alternative basis for denying coverage, I need not reach that issue because I have already determined that Educators's determination that Dr. and Diane Leonard were not eligible employees was reasonable.  Second, to the extent that Educators raises the issue of misrepresentation because it seeks summary judgment in its favor on its counterclaim, Educators's motion only requested the court grant summary judgment in its favor on *plaintiff's* claims.  Finally, despite the fact that all parties have proceeded under the assumption that ERISA

governs the policy in this case, they have addressed the issue of misrepresentation under Pennsylvania law.  However, ERISA preempts such a claim.  Section 1144(a) of ERISA provides that ERISA's provisions supersede "any and all state laws insofar as they may or hereafter relate to any employee benefit plan."  29 U.S.C. § 1144(a).  This preemption is "deliberately expansive."  *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45 (1987).  According to the Third Circuit, a state law claim relates to an ERISA employee benefit plan if: (1) the existence of an ERISA plan is critical to establishing liability and (2) the court's inquiry would be directed to the plan.  *See 1975 Salaried Retirement Plan v. Nobers*, 968 F.2d 401, 406 (3d Cir. 1992).  As a consequence, federal common law governs an insurer's decision to rescind coverage based on a insured's material misrepresentation.  *See McBride v. Hartford Life & Accident Ins. Co.*, 2007 U.S. Dist. LEXIS 16917, *63 (E.D. Pa. Jan. 29, 2007) ("Federal common law permits rescission of ERISA policies for material misrepresentations or omissions if they are: (1) false, (2) made with knowledge of their falsity, (3) material, and (4) relied upon by the insurer.") (citing *Shipley v. Ark. Blue Cross & Blue Shield*, 333 F.3d 898, 904-06 (8th Cir. 2003)).

## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HAROLD L.  LEONARD,<br>d/b/a The Leonard Clinic of Chiropractic,<br>Plaintiff, | : : : : : : : : | CIVIL ACTION<br><br>NO. 04-5310 |
| v. | | |
| EDUCATORS MUTUAL LIFE INSURANCE CO.,<br>Defendant. | | |

## ORDER

AND NOW, this _____ day of October, 2007, upon consideration of defendant Educators Mutual Life Insurance Company's motion for summary judgment (Docket No. 28), plaintiff's response, and defendant's reply, as well as the parties' supplemental briefing on the issue of this court's subject matter jurisdiction, it is hereby ORDERED that defendant's motion for summary judgment is GRANTED and judgment is ENTERED in favor of defendant Educators Mutual Life Insurance Company and against plaintiff Dr. Harold Leonard d/b/a The Leonard Clinic of Chiropractic on plaintiff's complaint.

s/William H. Yohn Jr.
William H. Yohn Jr., Judge